**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-0871-WJM-NRN

BROOKSHIRE DOWNS AT HEATHERRIDGE CONDOMINIUM ASSOCIATION, INC., a Colorado corporation,

    Plaintiff,

v.

OWNERS INSURANCE COMPANY, a foreign corporation,

    Defendant.

---

## ORDER RESOLVING PLAINTIFF'S
## AS-CONSTRUED SECOND MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Brookshire Downs at Heatherridge Condominium Association, Inc. ("Plaintiff") sues Defendant Owners Insurance Company ("Defendant") for breach of insurance contract and unreasonable delay or denial of insurance benefits under Colorado Revised Statutes §§ 10-3-1115 and -1116. (*See* ECF No. 1.) By way of a summary judgment motion filed by Plaintiff, the parties previously presented to the Court a potentially dispositive legal issue. Specifically, the insurance policy in question states that lawsuits seeking coverage (*i.e.*, breach of contract) must be brought within two years from the date of loss. *See Brookshire Downs at Heatherridge Condo. Ass'n, Inc. v. Owners Ins. Co.*, 324 F. Supp. 3d 1201, 1203 (D. Colo. 2018) (ECF No. 71). But the loss at issue here, hail damage, occurred on September 29, 2014, and Plaintiff did not file suit until April 7, 2017. *Id.* Given this, Defendant asserted in its second affirmative defense that the contractual statute of limitations had expired. (*See* ECF No.

16 at 9, ¶ 2.)  Plaintiff then moved for summary judgment that this affirmative defense fails as a matter of law in light of a Colorado statute that invalidates such contractual limitations periods in "homeowners" insurance policies.  (*See* ECF No. 36.)

The Court denied Plaintiff's motion, holding that Plaintiff's insurance policy was not a "homeowners" policy within the meaning of the statute.  *Brookshire Downs*, 324 F. Supp. 3d at 1203–06.  Thus, it appeared that this lawsuit should be dismissed as untimely.  But Defendant had not cross-moved for summary judgment.  Pursuant to Federal Rule of Civil Procedure 56(f), the Court ordered Plaintiff to show cause why summary judgment should not enter in Defendant's favor.  *Id.* at 1206–07.

Plaintiff responded with what was, for the most part, a veiled summary judgment motion.  (ECF No. 77.)  Plaintiff asserted Colorado's "reasonable expectations doctrine" (discussed below) as an alternative basis for disregarding the contractual statute of limitations, and also argued that its statutory unreasonable delay/denial claim could go forward regardless.  The Court then entered the following order (bracketed numerals refer to CM/ECF docket entries):

> Before the Court is its Order to Show Cause [71] and Plaintiff's response [77].  The response is, in substance, a second motion for summary judgment, in violation of the undersigned's Revised Practice Standard III.E.2.  The motion also raises new arguments that could have and should have been raised previously, and the Court could therefore deem these arguments forfeited.  *Cf. Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 791 (10th Cir. 2013) (party forfeited counterargument that was not raised in a summary judgment response but naturally should have been, given that it would have mooted analysis of other arguments made in the summary judgment motion).  Solely in the interest of substantial justice, however, the Court will not strike the response nor deem Plaintiff to have forfeited its new arguments. . . .  Plaintiff's response [77] to the Court's Order to Show Cause is CONSTRUED as Plaintiff's Second

2

> Motion for Summary Judgment. Defendant shall respond
> and Plaintiff may reply according to the [Court's normal
> procedures]. Pursuant to Fed. R. Civ. P. 56(f), Plaintiff is
> hereby given notice that the Court may grant summary
> judgment in Defendant's favor, despite Defendant's failure to
> move, on the arguments raised in Plaintiff's original Motion
> for Summary Judgment [36] and in Plaintiff's construed
> Second Motion for Summary Judgment [77].

(ECF No. 79.)

The matter being fully briefed, the Court is prepared to rule on Plaintiff's as-construed second summary judgment motion. For the reasons explained below, the Court rejects Plaintiff's reasonable expectations argument and grants summary judgment in Defendant's favor on its affirmative defense of untimeliness. However, Defendant does not appear to contest Plaintiff's position that the statutory unreasonable delay/denial claim may go forward regardless. Therefore, the Court does not grant summary judgment to either party on that claim. By separate order, the Court will call for further briefing to understand the scope and continued viability of a statutory unreasonable delay/denial claim when not anchored to a viable breach of contract claim.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the

nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

### A. Plaintiff's Policy

Plaintiff represents itself to be a condominium association comprising individual unit owners. (ECF No. 36 at 2, ¶ 1.)[1] A September 29, 2014 hailstorm damaged Plaintiff's property. (ECF No. 77 at 3, ¶ 1; *see also* ECF No. 1 ¶ 7.) Plaintiff was, at that time, insured against such losses through a policy issued by Defendant. (ECF No. 36 at 3, ¶ 5.) That policy contains the previously-mentioned requirement that a lawsuit seeking coverage must be "brought within 2 years after the date on which the direct physical loss or damage occurred." (*Id.* ¶ 6.) So, absent some exception, Plaintiff had until September 29, 2016 to file a lawsuit seeking coverage. (ECF No. 77 at 3, ¶ 3.)

### B. Events Before September 29, 2016

It is not clear when Plaintiff first raised the possibility of a claim with Defendant. A third-party adjuster hired by Defendant, John Epperson, inspected Plaintiff's property

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

on May 27, 2015, and reported seeing no damage. (*Id.* ¶ 4; ECF No. 77-2.) His report specifies September 29, 2014, as the potential date of loss, meaning Plaintiff must have said something to Defendant before May 27, 2015, about the previous September's storm. But Plaintiff itself alleges that it "filed its claim for benefits with Defendant" "[o]n or about June, 2015." (ECF No. 20 at 3, ¶ 4.) Regardless, on June 9, 2015, Defendant denied the claim, relying on Epperson's report. (ECF No. 77-3.)

Sometime before July 13, 2015, a third-party adjuster hired by Plaintiff, Scott Benglen, sent a letter to Defendant dated June 19, 2015, reporting the results of his inspection from the previous day. (ECF No. 77 at 3, ¶ 6; ECF No. 77-4.) The letter contains photographs of what Benglen represented to be hail damage on Plaintiff's property. (*Id.*)

On July 13, 2015, Defendant's field claims representative, Jayme Larson, requested a re-inspection of the property, and she hired a third-party named Mark Burns to conduct the re-inspection. (ECF No. 77 at 3, ¶ 7.) On July 29, 2015, Larson reported to Epperson (Defendant's original third-party inspector) that Burns had found hail damage. (*Id.* at 4, ¶ 8.) She directed Epperson to contact Burns. (ECF No. 77-6.)

On August 25, 2015, Larson e-mailed Epperson's employer about the status of a repair estimate: "Can someone please find out if the estimate is in progress and give us a status update?" (ECF No. 77-7.) On September 16, 2015, Epperson's employer assigned another of its employees, Adam Monaco, to the claim. (ECF No. 77 at 4, ¶ 10.)

From Monaco's assignment in September 2015 until February 2016, nothing of substance happened because Monaco "was waiting for material and/or information from

5

the Plaintiff's public adjuster, Scott Benglen, in order to continue investigating the claim." (ECF No. 86 at 6, ¶ 4.) Finally, on February 26, 2016, Monaco gave Defendant his "reserve recommendation" of $140,000, exclusive of overhead and profit. (ECF No. 77 at 4, ¶ 11.) He further stated that he was "willing to negotiate" the overhead and profit percentage with "the PA [*i.e.*, Benglen]." (ECF No. 77-9.)

On April 5, 2016, Monaco provided to Defendant a comprehensive report recommending, among other things, partial roof replacement on some buildings of the condominium complex, and full replacement on other buildings. (ECF No. 77-10 at 2.) He further recommended that Defendant settle the claim for a replacement cost value of $209,644.90 ($5,000 lower than the actual replacement cost, to account for the deductible), with an initial disbursement of $141,586.60 (the actual cash value) and a final disbursement of $68,058.30 "once the full cost has been incurred." (*Id.*) Defendant then advanced $141,586.60 to Plaintiff, although under the condition that

> [i]t is understood our investigation is not complete and it may be later established that there is no legal obligation for payment under your policy. . . .
>
> * * *
>
> . . . payment of the advance is not intended to change or modify any of the conditions, terms, provisions or requirements contained in the policy. Any obligations or other legal rights which may now or hereafter be available to you or the company are reserved.

(ECF No. 86-15.)

On May 13, 2016, Benglen reported to Monaco that Plaintiff's contractor found new damage while performing preliminary work on the claim. (ECF No. 77 at 4, ¶ 14.) On June 9, 2016, Benglen provided a supplemental repair estimate based on the newly discovered damage. (*Id.* ¶ 15.) On July 5, 2016, Monaco reported to Defendant,

6

> I am preparing a revision to the claim with the recommendation for the full roof replacement. I previously discussed the claim with [Larson] and was directed to prepare the claims with a partial repair/replacement. After review and consideration, I have revised my opinion based on the percentage of replacement that was approved, a full replacement may have been appropriate.[2]
>
> Please provide me your thoughts and direction.

(ECF No. 77-14.)

Monaco inspected the property again, with Benglen, on August 15, 2016. (ECF No. 77 at 5, ¶ 17.) Benglen expressed to Monaco his belief that "any percentage of hail damage to the [roof] slope constitutes [an entitlement to full roof] replacement due to the fact that the shingle is no longer manufactured." (ECF No. 77-15.) A week later, Monaco reported on this visit to Defendant with a recommendation "to add the slopes to the claim to reach an agreed upon settlement . . . . I will wait on your opinion and discussion." (ECF No. 77-16.) On September 11, 2016, Monaco again sought "direction on final settlement" from Defendant "so that this claim may be closed successfully." (ECF No. 77-17.) On September 25, 2016, Monaco transmitted to Defendant photographs from the August 15, 2016 re-inspection. (ECF No. 77 at 5, ¶ 20.) This was the last event of relevance to this lawsuit before the September 29, 2016 expiration of the contractual statute of limitations.

## C. Events After September 29, 2016

On October 6, 2016, another of Defendant's field claims representatives, Chad Kimball, introduced himself to Monaco by e-mail and requested a time to talk. (ECF No. 77-19.) On October 12, 2016, Monaco provided Kimball with revised estimates. (ECF

---

[2] This sentence is reprinted verbatim. It appears to be missing something.

No. 77 at 5, ¶ 22.) On October 18, 2016, Monaco recommended that Defendant "supplement[] for the replacement of the entire surface based on numerous factors. . . . I . . . would appreciate your direction and advise [*sic*]. Please call or email me so that I may close this claim." (ECF No. 77-21.)

On November 18, 2016, Benglen e-mailed Kimball asking for an update on "the revised estimate based on the re-inspection with Adam Monaco and also the depreciation release? [¶] What do you need from us to move this claim forward?" (ECF No. 77-23.) Kimball replied on November 29, 2016, that "[w]e would not owe to match the shingle if it is no longer made. At this point in time we are standing by the original estimate." (ECF No. 77-24.) Apparently in reference to the depreciation release, Kimball added, "Please forward a final invoice and pictures of the completed work once the repairs are complete." (*Id.*)

On December 21, 2016, Benglen submitted certificates of completion and invoices (although not photographs) to obtain the depreciation payment. (ECF No. 77 at 6, ¶ 27.) Kimball responded on January 3, 2017, that his records showed the total amount claimed by plaintiff for the roof repair was just short of $100,000 but that Defendant had already issued a check to Plaintiff for more than $140,000. (ECF No. 77-26.) According to Kimball's reading of the policy, no further payment was required under the circumstances. (*Id.*) But Defendant partially changed course the following month. On February 27, 2017, one of Defendant's claim examiners authorized a depreciation payment of about $34,000. (ECF No. 77 at 7, ¶ 29.)

Plaintiff filed this lawsuit on April 7, 2017, alleging breach of contract and unreasonable delay or denial of insurance benefits under Colorado Revised Statutes

§§ 10-3-1115 and -1116. (ECF No. 1.)

## III. ANALYSIS

### A. Reasonable Expectations

As noted, Plaintiff first invokes the "reasonable expectations doctrine." (ECF No. 77 at 7–11.) The Colorado Supreme Court has summarized that doctrine as follows:

> Given insurance policies' unique nature, which includes significant potential for insurers to take advantage of or mislead insureds, such policies are subject to heightened scrutiny, including the doctrine of reasonable expectations, which obligates insurers to clearly and adequately convey coverage-limiting provisions to insureds. In Colorado, the reasonable expectations of insureds have succeeded over exclusionary policy language in two main situations:
> (1) where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue; and
> (2) where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable person would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain otherwise.

*Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1048–49 (Colo. 2011).

Cases discussing the reasonable expectations doctrine almost exclusively describe it as a means of modifying an insurance policy's "coverage," in the technical sense of "coverage" (a risk against which the policy insures) versus "exclusion" (a risk explicitly not covered). *See* Black's Law Dictionary, *s.v.* "coverage" (10th ed. 2014) ("Inclusion of a risk under an insurance policy; the risks within the scope of an insurance policy."); *id.*, *s.v.* "exclusion" (definition 3) ("An insurance-policy provision that excepts certain events or conditions from coverage."). *Bailey*, for example, speaks of

- overcoming "*exclusionary* policy language";
- insureds who "fail to understand that [they are] not entitled to *the coverage*

9

> *at issue*";

- the application of reasonable expectations "when *policy coverage-provisions* may not be ambiguous"; and

- determining "whether *certain coverage* exists."

255 P.3d at 1048–51 (emphasis added); *see also id*. at 1052–55 (similarly discussing "coverage"). Thus, one might reasonably understand reasonable expectations as a doctrine that addresses whether an insurance policy should be construed to cover a particular risk.

However, *Bailey* also summarizes, without hint of disapproval, a Colorado Court of Appeals decision that applied reasonable expectations to the existence and enforcement of the policy as a whole:

> [I]n *Leland v. Travelers Indemnity Co. of Illinois*, the insured purchased an insurance policy but failed to timely pay the premium. 712 P.2d 1060, 1063 (Colo. App. 1985). After the insured received a notice stating that the policy would be cancelled unless payment was received by a certain date, he sent in a check, which he, through oversight, neglected to sign. *Id*. The insurer then sent a form letter to the insured stating that it was unable to process the payment because of the missing signature, and asking the insured to correct the problem and return the check signed; the letter did not state his insurance had been cancelled because the payment due-date had already passed. *Id*. The insured immediately returned a signed check, but the insurer returned payment to him because the policy had already been cancelled. *Id*. Our court of appeals held that the doctrine of reasonable expectations precluded the insurer from denying coverage, as "an ordinary layperson" reading the form letter "could reasonably conclude that execution and return of the unsigned check would result in continued or reinstated coverage." *Id*. at 1064. The form letter, attributable to the insurer, established reasonable coverage expectations. *See also State Comp. Ins. Fund v. Wangerin*, 736 P.2d 1246, 1248 (Colo. App. 1986) (holding that an insurer's acceptance of a premium created reasonable expectations of coverage

in the insured).

*Id.* at 1055–56. Accordingly, the reasonable expectation doctrine may still apply to arguments such as Plaintiff's that do not relate to "coverage" in the strict sense.

Plaintiff does not claim that this situation falls within the first type of reasonable expectations cases, *i.e.*, "where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue." *Bailey*, 255 P.3d at 1048–49. Plaintiff admits, rather, that the contractual statute of limitations "unambiguously requires Plaintiff to file suit prior to the expiration of two years after the date of loss." (ECF No. 77 at 9.)

Plaintiff instead emphasizes the second manifestation of reasonable expectations, *i.e.*, "where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable person would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain otherwise." *Bailey*, 255 P.3d at 1049. Plaintiff contends that the two-year contractual statute of limitations creates "an expectation that the adjustment of the loss, and payment thereof, will be completed within two years." (ECF No. 77 at 10.) But in this case, says Plaintiff, "Defendant's [continued adjustment of the claim after September 29, 2016] reasonably led Plaintiff to expect that its right to receive benefits under the policy's coverage provisions would not be hindered by the two-year suit limitation." (*Id.* at 10–11; *see also id.* at 2 ("Because an objectively reasonable insured would assume by Defendant's conduct after the two-year limitations period that the provision would not be enforced by the insurer, the Court should find the provision unenforceable.").)

Plaintiff's specific argument—that the insurer's conduct *after* the two-year limitations period lapsed created a reasonable expectation that the limitations period

11

would not be enforced—is nonsensical. Comparing two illustrations shows the problem:

> **Illustration 1.** On the morning of September **29**, 2016, Plaintiff calls Defendant and says, "According to the policy, today's the last day we can file suit. We plan to file suit later today." Defendant's representative responds, "Because we are still in the process of adjustment, you do not need to file suit yet. We will not enforce the two-year contractual limitations period." Plaintiff relies on Defendant's representative's statement and chooses not to file suit on September 29, 2016.
>
> **Illustration 2.** On the morning of September **30**, 2016, Plaintiff calls Defendant and says, "We just realized that the statute of limitations expired yesterday. Are you going to stand on that?" Defendant's representative responds, "Because we are still in the process of adjustment, you do not need to file suit yet. We will not enforce the two-year contractual limitations period." Plaintiff relies on Defendant's representative's statement and chooses not to file suit until April 7, 2017.

Illustration 1 raises a classic estoppel question that is probably also addressable, in the insurance context, through the reasonable expectations doctrine. *See Wangerin*, 736 P.2d at 1248 (describing "estoppel and waiver" and "[t]he related rule of reasonable expectation[s]"). But Illustration 2 is does not fit the same mold, or any mold of which the Court is aware, because Plaintiff did not rely to its detriment on Defendant's statement.[3] The detriment was already inflicted when September 29 rolled into September 30, at which point *any* suit would be untimely. To make Illustration 2 look anything like Illustration 1, Plaintiff would need to argue that there remained some advantage to filing suit sooner-although-still-late rather than even later. Plaintiff makes

---

[3] This stands in contrast to the *Leland* case, summarized in *Bailey, supra*. In *Leland*, the insurer's representations about signing and sending back the mistakenly unsigned check led the plaintiff to sign and remit the check, instead of seeking another insurance policy, and the plaintiff was in a car accident between the time he returned the signed check and the time the insurance company notified him of its refusal to issue a policy. 712 P.2d at 1063.

no such argument here, and the Court is aware of none.

Nonetheless, the Court will construe Plaintiff's argument generously—particularly the claimed "expectation that the adjustment of the loss, and payment thereof, will be completed within two years" (ECF No. 77 at 10)—as an argument that Defendant's conduct *on or before* September 29, 2016 created a reasonable expectation that Defendant would not "deny coverage" in the extended sense of seeking to enforce the policy's two-year limitations period. To succeed on this argument, Plaintiff

> must demonstrate through extrinsic evidence that its expectations of coverage are based on specific facts which make these expectations reasonable. These specific facts must show that, through procedural or substantive deception attributable to the insurer, an objectively reasonable insured would have believed he or she possessed coverage later denied by an insurer.

*Bailey*, 255 P.3d at 1054 (internal quotation marks and citation omitted; alterations incorporated).

Plaintiff has not satisfied its burden of establishing specific facts which make its expectation reasonable. Plaintiff points to nothing other than the fact that adjustment of the claim was ongoing. (ECF No. 77 at 9.) Plaintiff does not attempt to establish that Defendant's adjustment activities were anything out of the ordinary, or that they had any effect on Plaintiff's expectations regarding the two-year contractual limitations period. Moreover, Plaintiff waited from the end of September 2014 until late May or early June 2015—about eight months—to even file a claim with Defendant. Plaintiff submits no explanation for that delay. It is also undisputed that another five months of delay (approximately September 2015 until February 2016) is attributable to the time it took Plaintiff's public adjuster, Benglen, to supply needed information to Defendant's adjuster, Monaco. (ECF No. 86 at 6, ¶ 4.)

13

Significantly, the latest-in-time act on Defendant's part that Plaintiff deems relevant to its current argument is the February 22, 2017 partial payment for depreciation. (ECF No. 77 at 7, ¶ 29.) All else being equal, if Plaintiff had reported its claim to Defendant within, say, one month of the September 2014 hailstorm, then Defendant would have authorized that last payment in or around June 2016. In turn, Plaintiff's expectation "that the adjustment of the loss . . . will be completed within two years" (ECF No. 77 at 10) would have been realized with time to spare. Or, if Benglen had not delayed five months in providing information to Monaco, Defendant would have authorized the last payment likely in September 2016, a little before the September 29, 2016 deadline. And, of course, if Plaintiff had not delayed filing a claim *and* Benglen had not delayed providing information to Monaco, Defendant's last payment might have come more than a year before the lawsuit deadline.

In these specific circumstances, therefore, Plaintiff has not put forward even a *prima facie* case that the reasonable expectations doctrine applies.[4] For thoroughness, the Court will nonetheless address two policy concerns.

First, Plaintiff asks in its reply brief, "Does the policy's suit limitation actually require Plaintiff to sue its insurer for breach of contract *before* the insurer is finished adjusting the claim and *prior to* the insurer's decision to deny the claim?" (ECF No. 87 at 2 (emphasis in original).) This argument is based on the policy language itself and so is not "extrinsic evidence" regarding "expectations of coverage." *Bailey*, 255 P.3d at 1054. Even so, it is more to the insurer's detriment than the insured's to create a regime that requires the insured to sue before the insurer has fully adjusted the claim.

---

[4] To the extent this is a fact question, the Court finds that no reasonable jury could find for the Plaintiff on this matter.

The insurer will be facing lawsuits that, in some cases, did not need to be filed. If it moves to dismiss those lawsuits as unripe, it will have a hard time explaining to a court why the plaintiff should have waited despite the policy's two-years-from-date-of-loss requirement. Thus, Plaintiff's question raises an interesting consideration, but not one that implicates the reasonable expectations doctrine.

Second, the Court understands that a contractual limitations period measured from the date of loss, combined with the normal activities of adjusting a claim, is potentially easily abused by the insurer to avoid lawsuits. In other words, an insurer could intentionally prolong the adjustment process, or otherwise lull the insured into inaction with respect to a looming limitations deadline, until the two-year lawsuit window closes. In such circumstances, the reasonable expectations doctrine might apply, and equitable estoppel is also a conceivable remedy. *See, e.g.*, *Crawford v. McLaughlin*, 473 P.2d 725, 731 (Colo. 1970). But on the facts Plaintiff has presented here, it has failed to put forward extrinsic evidence from which the Court could conclude that Plaintiff reasonably expected coverage to continue beyond September 29, 2016. And, again, it must be borne in mind that Plaintiff itself bears responsibility for about eight months of the delay incurred during the adjustment process, and its adjuster bears responsibility for another five months.

Therefore, on the record presented, Plaintiff fails to show that the reasonable expectations doctrine may override the policy's two-year suit limitation. Plaintiff's request for summary judgment will be denied, and summary judgment will instead be granted to Defendant on its second affirmative defense.

## B. Unreasonable Delay or Denial

Plaintiff argues that at least its claim for unreasonable delay or denial under

Colorado Revised Statutes §§ 10-3-1115 and -1116 should go forward because the language of the policy does not require *all* lawsuits to be brought within two years, but only lawsuits seeking coverage. In that light, and because unreasonable delay/denial necessarily focuses on the insurer's actions after a claim has been reported, Plaintiff argues that the unreasonable delay/denial claim may go forward, subject to its own two-year statute of limitations. (ECF No. 77 at 11–13.)[5] In other words, Plaintiff says that it may still sue for Defendant's alleged unreasonable actions as far back as April 7, 2015, two years back from the date Plaintiff filed suit. (*Id.* at 13.)

Defendant responds as follows:

> Owners agrees with Plaintiff that a two-year statute of limitation likely applies to its statutory bad faith claim . . . . Therefore, as Plaintiff agrees, any statutory bad faith conduct premised on Owners' conduct two-years prior to when Plaintiff filed suit, *i.e.* April 7, 2015, is barred by [the] statute of limitations.

(ECF No. 86 at 14.)

Defendant's response is somewhat surprising. First, it is not clear what victory Defendant thinks it has won through Plaintiff's apparent concession, considering that the entire adjustment process took place after April 7, 2015. Second, this Court normally holds that "statutory bad faith," meaning statutory unreasonable delay/denial, is derivative of a successful breach of contract claim. *See, e.g.*, *Johnson v. Am. Nat'l Prop. & Cas. Cos.*, 2019 WL 463026, at *5 (D. Colo. Feb. 6, 2019). Thus, there is authority for the notion that Plaintiff's unreasonable delay/denial claim should stand or

---

[5] Plaintiff recognizes that no Colorado state court decision has definitively announced the statute of limitations for unreasonable delay/denial, but Plaintiff also notes that Colorado's default limitations period is two years from the date the injury, loss, or damage is, or should have been, discovered. (*Id.* at 12–13 (citing Colo. Rev. Stat. § 13-80-102).)

16

fall with its breach of contract claim. But the Court need not make arguments for Defendant that Defendant chose not to make for itself. Accordingly, the Court will not—in this order, at least—make absolute its Order to Show Cause as to Plaintiff's unreasonable delay/denial claim.

There is still some question in the Court's mind of how a freestanding unreasonable delay/denial claim should proceed. The Court understands that *common-law* bad faith claims may sometimes proceed even when a breach of contract claim is time-barred. *See Emenyonu v. State Farm Fire & Cas. Co.*, 885 P.2d 320, 323–24 (Colo. App. 1994). But common-law bad faith seeks damages apart from the insurance benefit (*e.g.*, consequential damages caused by delay in payment, emotional distress, punitive damages, etc.). *See generally* 8A John W. Grund *et al.*, *Colo. Practice Series: Personal Injury Torts & Insurance* §§ 56:19–56:22 (3d ed., Sept. 2018 update). Statutory unreasonable delay/denial, by contrast, awards "two times the covered benefit." Colo. Rev. Stat. § 10-3-1116(1). How does a court calculate this amount if there is no cause of action to determine coverage and the amount of the benefit? By separate order, the Court will order the parties to address how this lawsuit may proceed, and what any trial would look like, under these circumstances.

## IV. CONCLUSION

For the reasons explained below, the Court ORDERS as follows:

1. Pursuant to Federal Rule of Civil Procedure 56(f), the Court GRANTS summary judgment in Defendant's favor on its Second Affirmative Defense, and therefore Plaintiff's First Claim for Relief is DISMISSED WITH PREJUDICE; and

2. With respect to the portion Plaintiff's Response to Order to Show Cause (ECF

17

No. 77) arguing that Plaintiff's Second Claim for Relief (unreasonable delay/denial of insurance benefits) may go forward independent of Plaintiff's First Claim for Relief, the Court RESERVES RULING on whether to make absolute or discharge its Order to Show Cause (ECF No. 71) as to that claim for relief, pending further briefing that the Court will require by separate order.

Dated this 21st day of February, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge